# United States District Court
### for the
### Western District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

156 Clark Street, Buffalo, NY 14212

Case No. 17-MJ- 136

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The premises at 156 Clark Street, Buffalo, New York 14212, which is more fully described as a two-story, single family residence. The residence is white with a pink awning over the front porch and window. The front window contains white metal bars and the porch railing is black. The number "156" on the mailbox, which is to the left of the front door and the number "156" is also displayed on the metal railing on the front porch. (See Exhibit A, which is attached and incorporated herein by reference)

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

See Exhibit B, which is attached and incorporated herein by reference

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. §§ 841(a)(1), 846 and 844(a) *[statutory violation(s)]*.

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DAVID P. LEARY
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 26, 2017

*Judge's signature*

HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

City and state: Buffalo, New York

## AFFIDAVIT

STATE OF NEW YORK )
COUNTY OF ERIE ) SS:
CITY OF BUFFALO )

**David P. Leary**, Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice, Buffalo, New York, having been duly sworn, state:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and as such, I am an "investigative or law enforcement officer" of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in the Comprehensive Drug Abuse Prevention and Controlled Substance Act of 1970, Title 21 of the United States Code (USC), as amended. I have been a Special Agent with the DEA for approximately 8 years. As part of my employment with the DEA, I successfully completed DEA basic agent training, an intensive course covering all aspects of drug enforcement. Based on my training and conversations with other Special Agents and Task Force Agents of the DEA, I am familiar with how controlled substances are cultivated, manufactured, processed, packaged, distributed, sold, and used within the framework of drug trafficking.

2. This affidavit is made in support of a search warrant for the premises located at 156 Clark Street, Buffalo, NY 14212, (further described in Exhibit A, attached hereto and incorporated herein by reference) for the search and seizure of items in Exhibit B, attached hereto and incorporated herein by reference.

3. Beginning in or around May 2017, your affiant and other officers and agents of the United States Drug Enforcement Administration, Buffalo Resident Office, Group D-57 (DEA-BRO), conducted an extensive investigation into the drug trafficking activities of Alexander WATKINS and his criminal associates. The information contained in this affidavit is based upon your affiant's personal knowledge, reports and information received from other law enforcement officers and agencies, information gathered from the controlled purchases of narcotics, extensive surveillance and other law enforcement activities.

4. Your affiant's investigation revealed that WATKINS operates a heroin/fentanyl distribution organization based in Buffalo, New York. WATKINS obtains ounce quantities of heroin, which is mixed with fentanyl, and is responsible for the distribution of that heroin throughout Buffalo, NY.

A. **BACKGROUND INFORMATION**

5. In January 2017, Agents of the DEA-BRO initiated an investigation into heroin distribution in Buffalo, New York, specifically heroin mixed with fentanyl. In the course of this investigation, agents identified WATKINS as a heroin trafficker operating on the East side of Buffalo. Your affiant, along with other Agents obtained information from a confidential source (hereinafter referred to as "CS") that WATKINS is selling loose gram quantities of heroin mixed with fentanyl. Utilizing various investigative techniques, agents have corroborated the information provided by the confidential source and have determined, in fact, that the heroin sold by WATKINS is mixed with the potent narcotic fentanyl.

## B. CONFIDENTIAL SOURCE (CS) INFORMATION

6. In May, 2017 a CS advised Special Agent David Leary that WATKINS was trafficking heroin, crack cocaine and various prescription medications. The CS advised that WATKINS lived on either Lombard Street or Clark Street in the Broadway Market area of Buffalo, NY. The CS stated the CS had been purchasing heroin from WATKINS for the past year. The CS stated that WATKINS always mixes his heroin with other substances, including fentanyl. The CS stated that WATKINS sells the heroin/fentanyl in loose form, which, based on your affiant's training and experience, is indicative of a larger scale narcotics dealer. The CS stated that the CS had purchased up to 10 grams of heroin from WATKINS at one time. The CS stated the CS purchases heroin from WATKINS on a weekly basis. The CS stated the CS had also purchased Xanax prescription pills from WATKINS.

## C. CONTROLLED PURCHASE

7. On June 16, 2017, at the direction of DEA-BRO agents, the CS arranged to obtain 3 grams of heroin and 12 pills of alprazolam from WATKINS.

8. On June 16, 2017, at approximately 11:54 a.m., SA David Leary and SA Seborn Powell met with the CS at a neutral location. The CS and the CS's vehicle were searched for contraband by SA David Leary, yielding negative results. The CS was then equipped with a recording device.

9. At approximately 11:56 a.m., the CS placed a recorded call to WATKINS, which went unanswered. However, over several text messages between the CS and WATKINS,

3

WATKINS directed the CS to the area of Lombard Street in Buffalo, NY.

10. Before the scheduled controlled purchase, SA Leary turned over a quantity of DEA OAF to the CS to use in the purchase of controlled substances from WATKINS, as witnessed by SA Powell.

11. At approximately 12:25 p.m., Agents established surveillance in the area of the meet location. At approximately 12:36 p.m., the CS arrived at the meet location, as witnessed by SA Powell.

12. At approximately 1:32 p.m., agents observed the CS meeting with WATKINS near the garage on Lombard Street, as witnessed by TFO Kevin Gallagher. Moments later, WATKINS walked towards 155 Lombard Street towards the back entrance of the garage, as witnessed by TFO David Davidzik and SA Joseph Bongiovanni via aerial surveillance. The CS contacted SA Leary via cellular phone and reported that WATKINS gave the CS 1 gram of loose heroin and would return shortly with the rest of the heroin.

13. At approximately 1:38p.m., agents observed WATKINS leaving 155 Lombard Street and walking to a parking garage. At approximately 1:39 p.m., TFO Gallagher witnessed the CS and WATKINS conduct a narcotics transaction. WATKINS then walked back to 155 Lombard Street to the rear entrance as witnessed by SA Bongiovanni via aerial surveillance.

14. At approximately 1:40 p.m., surveillance was terminated. The CS left the meet location and went back to the neutral location followed by SA Leary. The CS turned over the heroin and pills that he purchased from WATKINS to SA Leary. The CS and the CS's vehicle were searched for contraband by SA Leary yielding negative results.

15. At approximately 1:54 p.m., the CS was debriefed by SA Leary and SA Powell and the CS stated that WATKINS wanted to meet in a parking lot (parking garage on Lombard Street). The CS saw WATKINS and began walking towards him. The CS met with WATKINS and exchanged OAF for the heroin. The CS told WATKINS he wanted more heroin and WATKINS left the area to retrieve more heroin. WATKINS later returned with additional heroin and 12 pills of Alprazolam. In total, the CS received approximately 3 grams of heroin and 12 pills of Alprazolam. Information gathered from the debrief is consistent with agents' observations and recordings of the transaction.

**D.  CONTROLLED BUY 2**

16. On August 10, 2017, at the direction of DEA-BRO agents, the CS arranged to obtain 10 grams of loose heroin from WATKINS.

17. At approximately 2:00 p.m., SA David Leary and SA Michael Terhune met with the CS at a neutral location. The CS and the CS's vehicle were searched for contraband by SA David Leary, yielding negative results.

18. At approximately 2:15 p.m., the CS provided several text messages between the CS and WATKINS discussing quantity and price for heroin.

19. Before the scheduled controlled purchase, SA Leary turned over a quantity of DEA OAF to the CS to use in the purchase of controlled substances from WATKINS, as witnessed by SA Terhune. The CS was equipped with a recording device.

20. At approximately 2:38 p.m., WATKINS contacted the CS, via cell phone, which was heard by SA Leary. During the phone call, WATKINS directed the CS to meet at 136 Herman Street, Buffalo NY.

21. At approximately 2:42 p.m., Agents established surveillance in the area of the meet location. At approximately 2:50 p.m., the CS arrived at the meet location.

22. Once at the meet location, WATKINS approached the CS vehicle and met with the CS. During the meet, WATKINS gave the CS 10 grams of loose heroin and the CS gave WATKINS the OAF.

23. WATKINS entered a vehicle, and surveillance followed WATKINS briefly before terminating surveillance. The CS left the meet location and went back to the neutral location followed by SA Leary. The CS turned over the heroin that he purchased from WATKINS to SA Leary. The CS and the CS's vehicle were searched by SA Leary for contraband, yielding negative results.

24. The CS was then debriefed by SA Leary and SA Terhune. The CS stated that the CS purchased the heroin from WATKINS. The CS stated that WATKINS was waiting at the corner to meet with the CS. Information gathered from the debrief is consistent with agents' observations and recordings of the transaction.

E. **CONTROLLED BUY 3**

25. On September 20, 2017, at approximately 11:20 a.m., SA David Leary and SA Michael Terhune met with the CS at a neutral location for the purpose of making a controlled purchase of heroin from WATKINS. The CS and the CS's vehicle were searched for contraband by SA David Leary, yielding negative results. The CS was then equipped with a recording device.

26. At approximately 11:36 a.m., the CS conducted a recorded phone call to WATKINS, as witnessed by SA David Leary and SA Michael Terhune. During the phone call, WATKINS and the CS agreed to meet in the parking garage behind the Broadway Market at approximately 12:00 p.m. The Broadway Market is located at 999 Broadway Street, Buffalo, NY 14212.

27. Before the scheduled controlled purchase, SA Leary turned over a quantity of DEA OAF to the CS to use in the purchase of controlled substances from WATKINS, as witnessed by SA Terhune.

7

28. While the CS was being prepared, agents of the Buffalo Resident Office (BRO) established surveillance in the area of the meet location (Broadway Market) and 155 Lombard Street, Buffalo NY.

29. At approximately 12:13 p.m., the CS arrived at the meet location as witnessed by SA David Turner. At approximately 12:22 p.m., SA Turner observed WATKINS walk to the CS's vehicle and speak to the CS at the driver's window. Once at the vehicle, WATKINS gave the CS approximately 4 grams of loose heroin and the CS gave WATKINS the OAF. The CS then drove away from the location followed by SA Leary.

30. Surveillance observed WATKINS cross Lombard Street and disappear between houses walking towards Clark Street. Surveillance was terminated at that time.

31. After arriving at the neutral location, the CS turned over the heroin that he purchased from WATKINS to SA Leary, as witnessed by SA Terhune. SA Leary searched the CS and CS's vehicle for contraband with negative results.

32. During the debriefing, the CS stated that the CS purchased the heroin from WATKINS, which was confirmed by surveillance. The CS stated WATKINS had approached the vehicle from Lombard Street but believed WATKINS used a "cut through" from Clark Street to get to Lombard Street. The CS believed WATKINS had a girlfriend on Clark Street and could be using her house to store the narcotics. The CS stated the CS gave WATKINS the OAF and WATKINS handed the CS the loose heroin. The CS stated WATKINS said the

8

heroin had no "cut" and was pure heroin. Information gathered from the debrief is consistent with agents' observations and recordings of the transaction.

33. At approximately 12:50p.m., SA Leary weighed the heroin and discovered the weight of the heroin to be under 4 grams. SA Leary stated to the CS that SA Leary believed the weight of the heroin should have been at least 3 more grams for the price the CS paid WATKINS. The CS conducted several text messages with WATKINS to voice the CS's concern over the low weight of the heroin. WATKINS agreed to give the CS more heroin to make up for the shortage. They agreed to meet at the same location, Broadway Market, around 1:15 p.m.

34. At approximately 1:15p.m., prior to the CS's meeting with WATKINS, the CS and the CS vehicle were searched for contraband by SA Leary and SA Terhune, yielding negative results. While the CS was being prepared, agents established surveillance in the area of the meet location (Broadway Market), Clark Street and 155 Lombard Street in Buffalo, NY.

35. At approximately 1:37 p.m., the CS arrived at the meet location, as witnessed by SA David Turner. At approximately 1:42 p.m., SA Christian Kozell witnessed WATKINS walking on Clark Street wearing the same clothes as he had on earlier in the day, minus the do-rag, and enter the front door of 156 Clark Street, Buffalo NY. At approximately 1:46 p.m. SA Kozell witnessed WATKINS exit 156 Clark Street and walk between two houses towards Lombard Street.

36. At approximately 1:48p.m., WATKINS met with the CS at the CS vehicle as witnessed by SA Turner. WATKINS handed the CS the heroin and stated the heroin was at least 2 more grams. The CS drove away from the location followed by SA Leary.

37. SA David Turner witnessed WATKINS enter the Broadway Market after meeting with the CS. Moments later, SA Shane Nastoff witnessed WATKINS exit the Broadway Market from a different door located on Broadway Street. Surveillance of WATKINS was terminated at that time.

38. After arriving at the neutral location, the CS turned over the heroin that he purchased from WATKINS to SA Leary, as witnessed by SA Terhune. SA Leary searched the CS and CS's vehicle for contraband with negative results.

39. During the debriefing, the CS stated that WATKINS gave the CS the heroin. The CS stated the CS believed WATKINS came from Clark Street to meet with the CS. The CS stated WATKINS entered the Broadway Market after the meet. Information gathered from the debrief is consistent with agents' observations and recordings of the transaction.

F. **156 CLARK STREET**

40. The DEA has determined that 156 Clark Street, Buffalo, New York, is primarily occupied by Alexander WATKINS. A police database revealed a current resident of 156 Clark Street for Alexander WATKINS. A utility check revealed the current utilities are in the name of Clarice Goodman, who has a mailing address of 1314 Kensington Street, Buffalo NY. Clarice

Goodman shows no record of residing at 156 Clark Street, Buffalo NY in all police databases searched.

41.  The premises at 156 Clark Street, Buffalo, New York 14212 is more fully described as a two-story, single family residence. The residence is white with a pink awning over the front porch and window. The front window contains white metal bars and the porch railing is black. The number "156" on the mailbox, which is to the left of the front door and the number "156" is also displayed on the metal railing on the front porch. A photograph of the premises is contained in Exhibit A.

42.  As set forth above, the various investigative techniques utilized as part of this investigation, along with information from a confidential source, physical surveillance and other law enforcement data have determined that WATKINS is engaged in the distribution of quantities of heroin to various drug customers throughout the Western District of New York area and that WATKINS utilizes 156 Clark Street as a location for narcotics-related meetings, distributing and stashing heroin/fentanyl, as well as keeping records, evidence and proceeds from such distribution.

43.  Based on my training, my experience, my participation in other narcotic investigations, my participation in this investigation, and my discussions with other experienced law enforcement personnel of the DEA, I have learned that:

    a.    significant narcotics traffickers such as dealers in large quantities of heroin/fentanyl and other controlled substances frequently maintain, at their residence, or other residences, amounts of heroin/fentanyl, and

11

   large amounts of currency on hand in order to maintain and finance their ongoing narcotics business;

b. narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distributions of controlled substances, including heroin and cocaine. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc., are generally maintained where the traffickers have ready access to them;

c. it is common for significant dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence or place of business, for ready access and to conceal same from the law enforcement authorities;

d. persons involved in drug trafficking or significant drug traffickers conceal proceeds of drug sales, records of drug transactions, firearms, ammunition, caches of drugs, large amounts of currency, financial instruments, keys of safe deposit boxes, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and/or evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking in their residences and in other secure locations including places of business in order to conceal them from law enforcement authorities;

e. narcotics traffickers commonly maintain records of telephone calls in billing statements, addresses or telephone numbers in books or papers which reflect names, addresses and telephone numbers of their associates in their narcotics trafficking organization, as well as photographs of themselves and their drug trafficking associates;

f. unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, in particular, trafficking in controlled substances; and that

g. weapons and firearms are among the "tools of the trade" in the narcotics business.

### No-Knock Permission Sought

44. Your affiant is aware that Title 18, U.S.C. Section 3109 requires law enforcement officers to "knock and announce" their purpose prior to entering pursuant to authority of a

search warrant. This application and affidavit seeks permission to enter without complying with this statute for the following above-listed residences: 156 Clark Street, Buffalo, NY. This Court can, upon application, grant such permission upon a review of reasons for a "no-knock" entry. In the instant case, your affiant/applicant has reasonable suspicion to believe that knocking and announcing will be dangerous or futile.

45. Because of the circumstances present in this investigation that may, possibly, create a danger to the executing Officers and Agents, as well as the possibility of destruction of evidence, your affiant is also applying for permission to enter without knocking. This investigation has revealed that the target is a seller of heroin. Based on your affiant's knowledge and experience with narcotics trafficking, there is a direct correlation between the distribution of narcotics and the propensity for violence and weapons possession.

46. Further, it is the opinion of your affiant, that to knock and announce may create danger to the law enforcement personnel if the occupants (who are sellers and/or users of heroin) are alerted in any way by the prior announcement of law enforcement.

47. Further, based upon my training and experience it is common for drug sellers and/or sellers of heroin to possess weapons. Any prior announcement, if weapons are present, may create a dangerous situation for law enforcement officers.

48. Your affiant reasonably believes that a covert/unannounced entry or a "no-knock" entry will operate to ensure that the occupants do not have time to destroy evidence,

and that the potential for danger (created by the presence of a number of heroin users, possible presence of weapons, dogs, and fentanyl) will be significantly reduced or eliminated if "no-knock" entry is granted.

49.   The facts and circumstances of this particular entry justify dispensing with the knock-and-announce requirement.

50.   Given the facts and circumstances described above, your affiant believes that knocking and announcing DEA presence would be dangerous or futile, and would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

51.   Your affiant respectfully requests that this Court examine the reasons set forth above and grant permission to effectuate this Search Warrant without compliance with the "knock-and-announce" requirement with the above-referenced residences.

**WHEREFORE**, based on the aforementioned facts and circumstances, your Affiant respectfully submits that probable cause exists to believe that the crimes specified in this affidavit have been committed and that there is presently concealed in the premises listed above, quantities of narcotics (specifically heroin and fentanyl), and other items described in this affidavit, and all of which are set forth in the Schedule of items to be seized (Exhibit B), which are all of which are evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, (conspiracy to possess and to distribute a controlled substance), Title 21, United States Code, Section 841(a)(1) (Possession with intent to distribute a controlled substance) and Title 21, United States Code, Section 844(a) (Possession of a controlled substance) and a search of the above described location will yield the items of evidence and instrumentalities related to those crimes.

_____
DAVID P. LEARY
Special Agent
Drug Enforcement Administration

Sworn to before me

this 26th day of September, 2017.

_____
HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

15